Robert Allen GAHL, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–85–01048–CR.

Court of Appeals of Texas, Dallas.

Oct. 23, 1986.

Michael P. Gibson, Dallas, for appellant.

John Nation, Asst. Dist. Atty., Dallas, for appellee.

Before VANCE, DEVANY and CARVER[1], JJ.

DEVANY, Justice.

Appellant, Robert Allen Gahl, was convicted of committing bribery in a trial before the court and sentenced to four years confinement. Appellant presents four points of error complaining that the indictment improperly joined offenses and did not give him adequate notice, that the audio and video tape recordings used by the state were inadmissible, and that the evidence is insufficient to support the conviction. Because we disagree with appellant's contentions, we affirm the judgment of conviction.

## THE INSUFFICIENCY QUESTION

In his fourth point of error, appellant claims that the evidence is insufficient to support the conviction. The evidence reveals that at the time of the offense, appellant was the Chief Building Official for the City of Dallas. He was charged with accepting a check for $15,741.44 from Jerry Stewart in exchange for appellant's approval of Riverpointe, a multi-family condominium project. Jerry Stewart and Bryan Thruston were with STB Architects and Planners in Dallas, a business they co-owned. Because of the project's unique design, it presented several problems requiring interpretations of the building code.

Stewart contacted appellant initially to discuss some of the building code interpretations. Stewart and Thruston met with appellant on April 3, 1984 for the first time. Appellant came to the STB offices and discussed the building and land planning concept with Stewart and Thruston. The three men also took a tour of Glen Lakes, another project which Stewart and Thruston had designed, to compare that project with Riverpointe. Before returning to his office, appellant promised Stewart and Thruston he would review the building code in light of their proposal.

On April 6 appellant called Stewart and suggested another meeting on Saturday, April 7. On that Saturday afternoon appellant again met with Stewart at the STB offices. This time, however, appellant gave Stewart interpretations of the building code that would severely hamper construction of the Riverpointe project. For example, the individual condominium units had changes in level of a step or two and appellant threatened to count each level as a separate floor. This interpretation would increase the number of exits otherwise required by the building code, change the number of floors in the project from three to six, and create severe design problems for the project. Appellant also disagreed with Stewart on the placement of exits.

1. The Honorable Spencer Carver, Justice, retired, Court of Appeals, Fifth District of Texas at Dallas, sitting by assignment.

During the meeting, appellant mentioned that he had once helped an architect in another city, but had not gained anything for that help. Appellant observed that Stewart had a problem with the building code interpretations and that he, appellant, had a problem with some land in Arizona. Appellant suggested that STB help him with his Arizona property, either through a purchase or loan. Stewart responded that he was not interested in purchasing any land outside the City of Dallas.

Following this meeting, Stewart told his partner Thruston that he thought appellant "had his hand out," and asked Thruston to be present with him during any future meetings with appellant.

On Thursday, April 12, at 9:00 a.m., Stewart and Thruston drove to appellant's office for a further meeting. At the beginning of this meeting, appellant told them, "You didn't help me with my problem, and I'm not going to be able to help you with your problem." Stewart then asked appellant what code interpretation would bar approval of the project. The three men then began a discussion which was interrupted at 10:00 a.m. because appellant had to attend a staff meeting. Stewart and Thruston decided to wait in appellant's office. After appellant returned, Stewart asked him pointblank, "What do you want?" Appellant responded by suggesting that they go to lunch.

At some point over lunch, Stewart mentioned that they had received favorable interpretations on a similar project. Appellant laughed and said, "You tell me any city that you've got a favorable interpretation and I can call them and get it changed."

During lunch, appellant also delved into the particulars of his land project in Arizona. Appellant commented that he had bought land in Arizona to develop but was not able to carry the debt. While appellant spoke, Stewart recorded figures on a waiter's check. Appellant wanted Stewart and Thruston to take care of the debt on his land in Arizona, make the interest payment, and assist him in purchasing a house

from Richard Minkoff, a Dallas builder. The house appellant wanted to purchase sold for $110,000; the debt on the Arizona land was $180,000, with an interest payment soon to be due for $15,000. The gross fee that Stewart and Thruston would earn from the Riverpointe project would be $64,000. At the close of the meeting, appellant commented that he wanted this transaction to be a "win-win" situation. Stewart told appellant that he would think about his proposal and get back to him.

After the meeting, Stewart contacted City of Dallas officials, and on Friday, April 13, met with City Manager Charles Anderson and representatives of the Dallas Police Department and the District Attorney's Office. As a result of this meeting, Stewart went back to his office and called appellant to set up a meeting for Saturday, April 14. The April 14 meeting and a later meeting on April 16 were monitored and recorded by representatives of the Dallas Police Department and an assistant district attorney.

The tapes of these meetings were played at trial. During the first meeting, appellant told Stewart and Thruston that he had reviewed his position on the units and was not going to change his interpretations, at least for the Riverpointe project. Stewart then asked, "Are you saying we don't have a problem?" Appellant responded:

I'm saying you do have a problem. But what I'm saying is that ... the reason I brought this thing up about my land in Arizona is that I think you do have a problem and ... I try to be a win-win person. Okay? And if I say, "Okay, guys, you got a problem; I think you have a nice project; I'm going to loosen the rule up even more," you guys have won, in that win-win situation. I won't say that I lost, but I haven't won anything.

Appellant then began talking about his land deal in Arizona, a venture he had once hoped would earn $5,000,000 for himself. Apparently, the venture had not fared as well as he had anticipated. Thus, it ap-

pears that he had an interest in involving Stewart and Thruston:

> I thought I was getting pretty far down the road with this thing (the land project in Arizona) and I ain't there yet. And, ... what I've done with this thing is I said "Well, maybe these guys, maybe these guys can help me." And, ... I decided to get out of it really nothing more than really what I've got in it and throw away my million dollar dream, ... which is the ... thing which I've asked you to help me with and, ... I guess that would give me a reason to look very closely at your project and see if there isn't a way that I can interpret this thing, so that with the sprinklering of the four-story units, or what-ever that go across to the garage, and nothing else, that you could go ahead and that your basic scheme, which you patented, could go forward in the City of Dallas. I ... think I have found a way to stretch the word so that ... I could come out with an interpretation, which I would write down and which would be the official interpretation.

It appears from further testimony that this interpretation had its price:

> I think I'd be being a really nice guy by doing that because I think ... I've stretched words quite a ways. I guess ... if we could both win ... and if you're as good as I think you are, at making things happen, I think the thing I'm suggesting that you get yourself tied into, that you don't want any part of at this point—you absolutely want no part of it at all ..., I think that that thing could end up making you a substantial amount of money ... and I just think you're better at doing this than I am.

It is apparent from the tapes that appellant knew that Stewart and Thruston had no great desire to help him and that appellant was "shoving it down your throat." At this point, Stewart and Thruston responded that they felt they had no problems with the project before they learned of appellant's new code interpretations on the Riverpointe project. Appellant then stated what he would do for them on the Riverpointe design:

> I would write an interpretation ... to my staff saying, "This is the way we're going to interpret it," and ... I would sign it and you can put it with your patent.

Thereafter, appellant suggested that Stewart and Thruston might trade one of their lots in the Glen Lakes Development for appellant's land in Arizona. The parties then spent some time discussing the particulars of appellant's Arizona land project.

Appellant then discussed proposed code interpretations with Stewart and Thruston. It is obvious from the tapes that if Stewart and Thruston helped appellant with his land problems, appellant would draft a favorable interpretation. Appellant further stated:

> I think I am saying to you ... is that ... I'm willing to be creative about the way the ordinance is interpreted so that your creative project can go forward.... I'd like to ... get something out of that creativity.... I think that if you go forward and do this, that you will probably win on both your dream and my dream.... you're going into this with your ... hands tied behind your back, I'm afraid and it's true. And I don't think you're going to love me a lot, as time goes on. I don't think you love me a lot right now, to tell you the truth.

Appellant then suggested that they consummate a joint venture and that Stewart and Thruston give him a check for $15,741.44 immediately. Stewart and appellant finally began to discuss when approval would come for the Riverpointe project. Appellant stated that he would "like to approve it after the first check goes in." Stewart told appellant that he could get a cashier's check in the required amount by Monday, April 16. The parties then broke off this meeting, agreeing to meet on Monday at 10:00 a.m.

During the second meeting, Stewart gave appellant a cashier's check for the amount requested. Appellant handed Stewart a draft of a letter which Stewart would have typed and sent to appellant

indicating the parties' understanding of appellant's interpretation of the building code. Appellant was arrested after leaving this meeting.

Other evidence was presented by Michael Coker, Assistant Director of Planning and Development for the City of Dallas, who testified that he was appellant's supervisor at the times relevant to this case. Coker testified that the building official's authority by city ordinance is to administer all construction codes and ordinances in the City of Dallas, as well as to interpret the development code, or zoning ordinances. According to Mr. Coker, the effect of obtaining a building permit means that the Building Inspection Division has reviewed the application and found it essentially in accordance with the rules and regulations, ordinances and building codes adopted by the City of Dallas. Appellant had the authority to overrule decisions, interpretations and exercises of discretion by members of his staff.

Victor Suhm, Assistant City Manager for the City of Dallas, testified that the chief building official had an enormous amount of power, because he had the authority to make interpretations and render decisions regarding the construction and development codes. Although the building official's decisions could be appealed to a review board, his decisions would be entitled to great weight there.

■ The gist of the offense of bribery is the conferring of a benefit upon a public servant as consideration for violation of one of his duties. *Hubbard v. State*, 668 S.W.2d 419, 420 (Tex.App.—Dallas 1984, no pet.). Although appellant denied committing the offense, there was controverting testimony which established the offense. The taped conversation served to confirm the ongoing bribe.

Appellant was convicted of accepting a benefit, namely a cashier's check for $15,-741.44, from Jerry Stewart, as consideration for appellant's decision, recommendation and exercise of discretion as a Building Official of the City of Dallas. This decision, recommendation, or exercise of discre-

tion was in the interpretation of the city building code as it related to the issuance of a building permit for a project designed by STB Architects and Planners, Inc. We hold the evidence is sufficient to support a conviction.

■ The standard of review on appeal for sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. State*, 672 S.W.2d 801, 803 (Tex.Crim.App.1984). The evidence in this case clearly indicates that a rational trier of fact could have found appellant guilty beyond a reasonable doubt. Appellant's fourth point of error is overruled.

## THE INDICTMENT

In his first point of error, appellant claims the trial court committed reversible error when it overruled his motion to quash the indictment, because the indictment improperly joined offenses. Relevant to the present case, the elements of bribery are:

A person solicits, accepts, or agrees to accept from another:

(1) any benefit as consideration for the recipient's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant, party official, or voter.

TEX. PENAL CODE ANN. 36.02(a)(1) (Vernon Supp.1986).

The first paragraph of the indictment returned against appellant reads as follows in pertinent part:

ROBERT ALLEN GAHL ... was a public servant, to wit: the Building Official of the City of Dallas, Texas, and said Defendant did then and there, *knowingly* and *intentionally, solicit* from JERRY W. STEWART a benefit, to wit: $15,-741.44 current money of the United State[s] of America, as consideration for said Defendant's *decision, recommendation* and *exercise of discretion* as said public servant in the interpretation of the

Building Code of the City of Dallas, Texas....

(Emphasis added.) Then, under what is labeled as "count two," the indictment reads exactly the same way except that it states appellant "knowingly and intentionally, *agree[d] to accept* from JERRY W. STEWART a benefit ..." etc. Finally, under what is labeled as "count three," the indictment reads the same as in the previous paragraphs except that it states that appellant "knowingly and intentionally, *accept[ed]* from JERRY W. STEWART a benefit, to wit: a *BancTexas White Rock Cashier's Check* in the amount of $15,-741.44 ..." etc.

■■■ Article 21.24(a) of the Code of Criminal Procedure allows two or more offenses to be joined in a single indictment when the offenses are (1) a certain type of property offense, and (2) if the offenses arise out of the same "criminal episode." *Drake v. State*, 686 S.W.2d 935, 944 (Tex. Crim.App.1985). Article 21.24 reads in pertinent part:

> Two or more offenses may be joined in a single indictment, ... with each offense stated in a separate count, if the offenses arise out of the same criminal episode, as defined in Chapter 3 of the Penal Code.

TEX.CODE CRIM.PROC.ANN. art. 21.24 (Vernon Supp.1986). At this point, it is important to remember that the offense of bribery is not a property offense. When we examine Chapter 3 of the Penal Code, we find it defines a criminal episode to mean the repeated commission of any one offense defined in Title 7 of that code, which covers offenses against property. TEX.PENAL CODE ANN. 3.01 (Vernon 1974). Article 21.24 of the Code of Criminal Procedure only covers property offenses, and bribery, under 36.02 of the Penal Code, is, therefore, not included within the purview of article 21.24. *See Ex parte Siller*, 686 S.W.2d 617,618 at n. 1 (Tex.Crim.App.1985). Thus, two separate *nonproperty* offenses may not be joined in a single indictment. *Drake v. State*, 686 S.W.2d 935, 944 (Tex.Crim.App.1985).

Appellant contends that the indictment is faulty in three respects: first, that it improperly joined offenses in violation of article 21.24; second, that it is duplicitous in that it stated that appellant "intentionally and knowingly" committed the behavior cited in each count; and third, that it is duplicitous in that, in each count, it stated that appellant received a benefit in exchange for his "decision, recommendation, and exercise of discretion" as a public servant. Appellant reads his indictment as effectively charging him with eighteen separate offenses. We cannot support this reading. In order to address his claims, we will review the law in this area.

First, we address the misjoinder question. In *Drake v. State*, 686 S.W.2d 935 (Tex.Crim.App.1985), the Court of Criminal Appeals interpreted article 21.24. *Drake* held that a defendant may not be charged with more than a single nonproperty offense in one indictment. 686 S.W.2d at 944. In *Callins v. State*, No. 69,023 (Tex. Crim.App., July 2, 1986) (not yet reported), that same court, in a plurality opinion by Judge Campbell, reiterated the *Drake* holding, but then added:

> For the State to avoid joinder problems, an indictment for a non-property offense, whether arising from one transaction or separate transactions, should contain only one count [footnote 11] and as many paragraphs [footnote 12] as are necessary to allege the various manners and means of committing the one alleged offense. (Footnotes 11 and 12 in original.) (Footnote 13 omitted.)

*Callins, slip op.* at 7–8. In the two noted footnotes to this proposition, Judge Campbell stated:

> [Footnote] 11 A "count" is the portion of an indictment that charges a distinct statutory offense. 22 Tex.Jur.3rd 665, *Criminal Law*, § 2370. *The presence of more than one count in an indictment, therefore, would necessarily mean that more than one offense had been charged.*

> [Footnote] 12 A "paragraph" is a subset of a count and is used to charge alterna-

tive methods of committing the same statutory offense. Art. 21.24(b), V.A.C.C.P.; *Riley v. State*, 658 S.W.2d 818 (Tex.App.—Fort Worth 1983, no pet.). The presence of single paragraphs within a single count, therefore, would not signify the charging of more than one statutory offense, but rather signify the alternate manner and means of committing the same statutory offense. *Riley, supra* (alternative means of committing murder may be charged in separate paragraphs of same indictment).

*Callins*, No. 69,023, slip op. at 8 (emphasis added). However, *Bates v. State*, 587 S.W.2d 121 (Tex.Crim.App.1979), sheds a different light on the authorities cited.

In *Bates*, also a bribery case, the defendant was charged with the following indictment:

> ... GARTH BATES hereinafter referred to as the Defendant, heretofore on or about July 16, 1976, did then and there unlawfully, acting as a party with Ed Riklin, *intentionally and knowingly solicit, accept, and agree to accept* from Nukie Fontenot a pecuniary benefit, namely, money, with the representation and understanding that the Defendant, a Texas District Judge presiding in the 174th District Court of Harris County, Texas, would be influenced in the specific exercise of his official *decisions, powers, duties and discretion* as a District Judge, namely that the Defendant would not sentence Nukie Fontenot to the Texas Department of Corrections in the felony case then pending against Nukie Fontenot in the 174th District Court of Harris County, Texas, and that the Defendant would help Nukie Fontenot in the felony case then pending against Nukie Fontenot in the 174th District Court of Harris County, Texas, and that the Defendant would be lenient in sentencing Nukie Fontenot in the felony case the [sic] pending against Nukie Fontenot in the 174th District Court of Harris County, Texas ..."

*Bates*, 587 S.W.2d at 129. (Emphasis added.)

■ Despite the fact that the solicitation of and the agreement to the bribery had taken place over a number of *months,* the *Bates* court held that "[the indictment] does not allege more than one offense, but rather alleges several *means* of committing the offense of bribery." 587 S.W.2d at 129. *See also Goldman v. State,* 130 Tex.Crim. 471, 95 S.W.2d 423, 424–25 (1936); *Mutscher v. State,* 514 S.W.2d 905, 917 (Tex.Crim.App.1974) (citing *Goldman* ) (that several conspirators may have been involved in a bribery plot did not necessarily show misjoinder of separate offenses: when defendants entered into an agreement to bribe, it was by one agreement among the conspirators, one offer, one acceptance and constituted one act). Therefore, in the instant case although the acts committed by appellant occurred on different days, as a matter of law, the acts constituted but one offense of bribery. *See Bates,* 587 S.W.2d at 129. Even though the State incorrectly *labeled* the paragraphs in the indictment "counts," the paragraphs were not transformed into counts simply by labeling them as such. The "counts" in the indictment were actually paragraphs because they simply alleged different manners and means of committing the offense of bribery. However, in light of the *Callins* language that "the presence of more than one count in an indictment ... would necessarily mean that more than one offense had been charged," *slip op.* at 8, we are of the opinion that the State should choose its terminology in indictments more carefully. However, in light of *Bates,* we hold that the indictment does not improperly join offenses in violation of art. 21.24., TEX.CODE CRIM.PROC. ANN. (Vernon 1966).

■ Neither is the indictment duplicitous. An indictment is duplicitous when it joins in a single count two or more distinct and separate offenses. *United States v. Robin,* 693 F.2d 376, 378 (5th Cir.1982). According to *Bates,* 587 S.W.2d at 129, the phrases "intentionally and knowingly" and

the phrases "decisions, powers, duties and discretion" do not allege separate offenses of bribery, but rather allege different manners and means of committing bribery. Appellant's indictment is remarkably similar to the one in *Bates*—the indictment said appellant "intentionally and knowingly" committed bribery in exchange for his "decision, recommendation and exercise of discretion" as a public servant. We hold that the phrase "intentionally and knowingly" and the phrase "decision, recommendation and exercise of discretion" are simply different manners and means of committing the offense of bribery. An indictment is not duplicitous if it merely alleges different manners and means of committing a single offense within the same paragraph. *See Callins, slip op.* at 8, n. 12. Appellant's first point of error is overruled.

In his second point of error, appellant claims that the trial court erred when it failed to quash the indictment because of inadequate notice. He claims that because the indictment alleged he committed the offense of bribery by a "decision," a "recommendation," or an "exercise of discretion," it failed to give him adequate notice to defend his case at trial. This contention is without merit.

██ Appellant correctly notes that under current law, in order to complain of a trial court's refusal to quash an indictment, the defendant must show:
(1) a defect of notice,
(2) whether this defect had an impact on the defendant's ability to prepare his defense, and
(3) how great an impact this defect had on the defendant's ability to prepare his defense.

*Adams v. State,* 707 S.W.2d 900, 903 (Tex. Crim.App.1986), *Opdahl v. State,* 705 S.W.2d 697, 699 (Tex.Crim.App.1986). The first step of the analysis is to decide whether the charging instrument fails to convey some requisite item of notice. If sufficient notice is given, this ends the inquiry. *Adams,* 707 S.W.2d at 903. We hold that the indictment gives sufficient notice.

██ The terms "decision," "recommendation," and "exercise of discretion" are simply different manners and means of committing the offense of bribery. *Bates,* 587 S.W.2d at 129. The State may plead alternative manners and means within a single indictment. *Callins,* No. 69,023, *slip op.* at 8, n. 12. If the State pleaded some or all of the possible manners and means of committing the offense, the accused would simply be on notice that the State would show all variants and he could prepare his defense accordingly. *Ferguson v. State,* 622 S.W.2d 846, 851 (Tex.Crim.App.1981). In the present case, appellant would be entitled to an election only if the State misjoined separate nonproperty offenses, which it did not. *Drake v. State,* 686 S.W.2d at 944. Because the indictment pleaded different manners and means of committing bribery, appellant was on notice that the State would prove all variants of the offense. Appellant's second point of error is overruled.

## THE TAPES

In his third point of error, appellant claims the trial court erred when it overruled appellant's pre-trial objections and trial objections to the admissibility of audio and video tape recordings.

Testimony at trial revealed that there were gaps totaling about thirty to thirty-five seconds in the recordings of the conversations between appellant and Stewart and Thruston. These gaps were caused by momentary errors in handling the tape equipment. Appellant contends that these gaps defeat the authenticity and correctness of the recording, one of the necessary predicate items for admission of the tapes. We disagree.

██ In order to introduce an audio tape recording, the State must establish that:
(1) the recording device was capable of taking testimony,
(2) the operator of the device was competent to record material,

(3) the recording is authentic and correct,

(4) there were no changes, additions or deletions made to the recording,

(5) the recording was preserved in a proper manner,

(6) all speakers are identified, and

(7) the recorded statements were elicited voluntarily and without inducement.

*Edwards v. State*, 551 S.W.2d 731, 733 (Tex.Crim.App.1977).

The existence of minor gaps in a recording will not defeat the third portion of the *Edwards* predicate. In *Quinones v. State*, 592 S.W.2d 933, 943–44 (Tex Crim. App.), *cert. denied*, 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121 (1980), the defendant argued that the State had failed to establish the necessary predicate because the tape had been altered with a fifteen second tape-over. The court held that defendant's objection was too general to preserve error, but added:

> In addition, the *Edwards* requirements do not mean that any alteration in a tape renders the tape per se inadmissible. If the alteration is accidental and is sufficiently explained so that its presence does not effect [sic] the reliability and trustworthiness of the evidence, the recording can still be admissible.

*Id.* at 944.

The facts concerning the gaps in the tape are as follows: Assistant District Attorney, Ted Steinke, and District Attorney Investigator, Jack Gaulding, were engaged in recording the conversations between appellant and Stewart and Thruston. Using portable tape recording equipment, Steinke and Gaulding recorded transmissions from a hidden microphone while they sat in a car some distance away. For the brief periods when it would be necessary to take out one cassette and substitute another, Steinke took a hand-held tape recorder and recorded the transmissions from the hidden microphone until the next cassette was in place. While Officer Gaulding was changing from cassette one to cassette two, Steinke attempted to record the ongoing conversations with his hand-held recorder, but for some reason was not able to record three to five seconds while the cassettes were being changed. Later, on side A of tape two, Steinke noticed a malfunction—the tape had jammed and was coming out of the machine. As a result, for three to five minutes, Steinke had to use the supplemental tape recorder while officers tried to get the tape working again. Steinke estimated that between the malfunction and activation of the supplemental tape recorder, ten to twenty seconds elapsed. On another tape side, Steinke lost two to three seconds of conversation because he accidentally let go of the record button on his supplemental tape recorder. The total time lost due to error was between thirty and thirty-five seconds.

Measured under the *Quinones* standard, it becomes clear that the small gaps in the tape recordings were insufficient to render these recordings inadmissible. All gaps were accidental and sufficiently explained by Mr. Steinke at trial. The total time lost was minimal: no more than thirty-five seconds out of conversations lasting over two hours. Appellant's third point of error is overruled.

We affirm the judgment of the trial court.