**Opinion filed December 31, 2018**



## In The

# Eleventh Court of Appeals

_____

## No. 11-16-00347-CR

_____

## VICTORIA GARCIA, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 39th District Court**
**Haskell County, Texas**
**Trial Court Cause No. 6833**

## M E M O R A N D U M   O P I N I O N

The jury convicted Victoria Garcia of the offense of theft of a firearm. The trial court assessed her punishment at confinement for fourteen months in the Texas Department of Criminal Justice-State Jail Division, and it sentenced her accordingly. We affirm.

Appellant presents three issues on appeal. First, Appellant contends that the trial court abused its discretion when it admitted the prior written statement of a witness who testified at trial. Next, Appellant claims that the State did not lay a

proper foundation for the admission of that statement. Finally, Appellant takes the position that because the State failed to authenticate video surveillance footage, the trial court erred when it admitted the footage into evidence.

During the relevant time, Dawn Wallace worked at a Stripes convenience store in Haskell. At around 3:00 a.m. on October 5, 2015, Appellant came into the store with a man known to Wallace as "Miguel." Wallace believes that they bought cigarettes. Appellant had a green Crown Royal bag on her wrist, and Wallace testified that Appellant either paid with money from that bag or some other place near the bag. Appellant later testified that she, like many people, used a Crown Royal bag to keep her money in and that she still had the bag. She demonstrated her point by taking a green Crown Royal bag out of her boot and claimed that it was the one she had used at the time that the video was made. Wallace testified that Appellant asked whether she could leave a letter for Karamy (Kara) Hendrix, an assistant manager at the Stripes store. Wallace also testified that Appellant asked whether the police were in the parking lot. Wallace told her that they were. According to Wallace, Appellant wrote the letter, went to the restroom, and left the store.

"Maybe 30 minutes, an hour maybe" after Appellant left the store, Wallace went to clean the restrooms. When she picked up the garbage bag from the trash can, underneath it, in the bottom of the trash can, she found "that Crown Royal bag" and "a little square thing." Wallace took the bag to the counter in the restroom, opened it, and saw a gun inside the bag.

Meanwhile, Officer Kenneth Brian Jones Jr., a Haskell police officer, had parked on the Stripes' parking lot about 3:00 a.m. Officer Jones saw Appellant enter the store and saw her come out of the store. When she came out of the store the first time, she looked at him and then went back inside the store; in "a little bit," she came

2

out again. After she came out the last time, she and another person drove away from the store.

After Wallace found the gun in the Crown Royal bag, she went to get Officer Jones. Wallace took Officer Jones into the restroom and showed him the Crown Royal bag with the gun in it, and she showed him the "little square thing." Wallace had thought that the "little square thing" was a broken toy; Officer Jones explained that it was a drug scale. The gun that Wallace showed Officer Jones was a .25 caliber Titan pistol.

Danny Myers had reported to the sheriff's office that his .25 caliber Titan pistol had been stolen and that his granddaughter, Appellant, had admitted that she had taken it. Myers testified that he kept the pistol under his mattress. He gave a statement to that effect to police. The contents of that statement are as follows:

> Around the first of October I noticed my black Titan Pistol .25mm was missing from my house. A couple of days later I asked my granddaughter Victoria Garcia if she knew what happened too it, she denied any thing about it of course. A few days after that she told me she HAD taken it from my house. After she told me that I came to the Sheriff's Office to report it to Officer Jones that she stole it from me, and I would like a criminal trespass on her so she can't come back over to my house.

The State questioned Myers about the statement. When asked whether he had reported to police that his granddaughter had taken the gun, Myers answered: "Well, that it had been taken by somebody." The State asked Myers whether he gave a statement to the police, and Myers replied: "They say I did." He first stated that the signature on the statement "looks like my signature" and later said that it was his signature. The prosecutor showed Myers the written statement and asked him whether it was the statement that he had given to the police. "Well, probably," he answered. Then Myers testified that he was a little foggy because it happened a long time ago and he had been in and out of the hospital and was then on medication.

3

Myers said that the statement was true, but then testified that other people could have taken the gun; he did not remember. He testified that he did not know who took it. Myers further testified that he would not have put "my black Titan pistol, 25-millimeter" in the statement because he had no idea what kind of pistol it was. His explanation was: "Maybe somebody put words in my mouth." He said that he did not think that he ever said that the gun was any certain kind of gun. When the State showed the gun to Myers at trial, he said that he had no idea if it was his gun. He also testified that the gun that was taken was not his—it belonged to an ex-wife.[1]

Myers also testified that he got mad at his granddaughter and that he should not have; this should have remained "a family thing." He tried to "drop the charges. They wouldn't let [him]." Myers told the jury that he did not "care about the gun. . . . I care about my granddaughter."

After Myers testified as set out above, the State offered the written statement into evidence. Appellant objected to the admission of the written statement "under hearsay and proper foundation and the best evidence rule." The trial court overruled the objection and admitted Myers's written statement into evidence. A limiting instruction was neither requested by the parties nor given by the trial court.

As we have stated, Appellant claims that the trial court erred when it admitted the statement because Myers had admitted at trial that he made the statement. Appellant further objected because the State had failed to lay a proper foundation to permit the admission of the statement in that the State did not show that the statement was the original one that Myers had given to the police but, rather, that it was a later one that he had given them.

---

[1]Appellant's uncle, Charlie Myers, testified that his father, Danny Myers, owned a pistol and that he usually kept it in his back pocket and sometimes kept it under his mattress. Although his father had testified that the pistol belonged to an ex-wife, Charlie Myers testified that his father bought the pistol from a friend. When the State showed the pistol to Charlie, he identified it as the one that belonged to his father. Appellant told Charlie that she had thrown the pistol into the trash at Stripes.

We review a trial court's evidentiary rulings for an abuse of discretion. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018); *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). A trial court abuses its discretion when its ruling falls outside the zone of reasonable disagreement. *Gonzalez*, 544 S.W.3d at 370.

Admissibility of prior inconsistent statements of witnesses is addressed in Rule 613 of the Texas Rules of Evidence. As a predicate matter, the party seeking to introduce the statement must tell the witness the contents of the statement and the time and place of the statement and must also tell the witness the name of the person to whom the witness made the statement. TEX. R. EVID. 613(a)(1). The party seeking to introduce the prior inconsistent statement must give the witness the opportunity to explain or deny the statement. TEX. R. EVID. 613(a)(3). Extrinsic evidence of the prior inconsistent statement is not admissible unless the witness is first examined about the statement and fails to unequivocally admit making the statement. TEX. R. EVID. 613(a)(4).

The State laid the proper predicate under Rule 613. It told Myers the contents of the statement, the time and place of the statement, and the person to whom the statement was made, and Myers was given the opportunity to explain or deny the statement.

Myers's admission that he gave the statement is at best equivocal. When the State asked Myers about his report to the police that his granddaughter had taken his gun, Myers answered: "Well, that it had been taken by somebody." When asked whether he gave a statement to the police, Myers replied: "They say I did." At one point, Myers said that the signature on the statement was his. At another point, he said that it "looks like my signature." When the State showed the written statement to Myers and asked him whether it was the one that he had given to the police, he responded: "Well, probably." However, Myers testified that it happened a long time

5

ago and that he had been in and out of the hospital and on medication. Although Myers said that the statement was true, he also testified that others could have taken the gun; he did not remember. Myers testified that he did not know who took it. He also testified that, because he did not know what kind of gun it was, he would not have put "my black Titan pistol, 25-millimeter" in the statement; "Maybe somebody put words in my mouth."

If the proper predicate is otherwise laid, and an admission is partial, qualified, or otherwise equivocal, a prior inconsistent statement is admissible for impeachment purposes. *McGary v. State*, 750 S.W.2d 782, 786 & n.3 (Tex. Crim. App. 1988); *Ruth v. State*, 167 S.W.3d 560 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). As is apparent from the testimony to which we have referred, Myers's admission that he made the statement was not unequivocal. We hold that the trial court did not abuse its discretion when it admitted Myers's prior inconsistent statement.

Even if we were to find that the trial court erred when it admitted the statement, which we do not, any such error would not have resulted in harm. An evidentiary ruling regarding admissibility will not result in reversal when other such evidence is received without objection. *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998).

Officer Jones testified as to what Myers had said when he made his statement. Officer Jones said that Myers told him that Appellant had taken his pistol, that his pistol was a black Titan .25, and that Appellant admitted, when Myers confronted her, that she had taken his pistol.

Because Myers's admission was not unequivocal, the trial court did not abuse its discretion when it admitted the statement for impeachment purposes. We overrule Appellant's first issue on appeal.

In her second issue on appeal, Appellant complains that the State did not show that the statement admitted at trial was the original statement given by Myers to

6

Officer Jones. The evidence is sufficient to show that, when Officer Jones initially interviewed Myers, he did not take a written statement from Myers. Later, Officer Jones presented a typewritten version to Myers, and Myers read it and signed it. The evidence shows that there was only one written statement, the one admitted into evidence. We overrule Appellant's second issue on appeal.

In her third issue, Appellant argues that the State failed to properly authenticate certain surveillance video footage before it was admitted at trial. The State offered, and the trial court admitted, a thumb drive that contained a copy of video surveillance footage taken at Stripes at the time that Appellant was in the store on the date that Wallace found the Crown Royal bag, the pistol, and the drug scales.

Appellant argued at trial that the footage was not accurate because the audio and video did not line up; they were not synced. In response to the objection, the trial court admitted the video portion only, and the audio portion was not played for the jury.

On appeal, Appellant's position is that the "footage was not properly authenticated to show [that] the images reflected reality and were relevant." We will discuss the issue as stated on appeal.

To properly authenticate an exhibit for admission, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." TEX. R. EVID. 901(a). It is within the jury's purview to "determine whether an item of evidence is indeed what its proponent claims; the trial court need only make the preliminary determination that the proponent of the item has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic." *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015) (citing *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012)); *see* TEX. R. EVID. 104(a). Testimony by a witness with knowledge that the evidence "is what it is claimed to be" satisfies the Rule 901(a) requirement. TEX. R. EVID. 901(b)(1).

Thus, the relevant question here is whether the surveillance video, as presented, was supported by sufficient evidence to establish that it was a video of the convenience store counter at the time in question. We hold that it was, and the trial court therefore did not abuse its discretion in admitting the video.

The trial court ordered that the surveillance video be played without audio. A videotape that contains no audio is akin to "motion pictures," which are "just a collection of photographs and the rules surrounding admission are the same as those for still photographs." *Gordon v. State*, 784 S.W.2d 410, 411 (Tex. Crim. App. 1990) (quoting *Marras v. State*, 741 S.W.2d 395, 404 (Tex. Crim. App. 1987)); *see also Huffman v. State*, 746 S.W.2d 212, 222 (Tex. Crim. App. 1988).

Here, both the assistant store manager—Hendrix—and Officer Jones testified as to the authenticity of the video. Hendrix testified about the camera equipment in place at the convenience store, stated that the equipment made an accurate recording of the store, and said that she personally had reviewed the video footage and made a copy of the footage. Hendrix further testified that there is no way to alter a video taken on the store's recording system. She also explained that any pauses in the video playback would be due to the process of converting from live feed camera to a recording but that the video would nonetheless be an accurate recording that "will pick right back up" where it left off:

> There's every so often in live video feed where it may pause for a second and pick back up on it; that is a time lapse. That's what you get when you get live video. It's not recording straight onto a DVD or a tape; it's live feed. And you're going back on a computer, on a network, to do it, so there is time lapse every so often in that. And, normally, it's -- within 24 hours, it time lapse[s] at least once, but it will pick right back up on it when you burn it.

Officer Jones testified that Wallace had described for him what she saw during the early morning hours in question; the video is consistent with what Wallace told Officer Jones that she saw. He had no reason to doubt the authenticity of the video.

8

Officer Jones identified Appellant as being in the video. At trial, Appellant also identified herself in the video.

Officer Jones testified that he obtained the surveillance footage from the store, that he had no reason to doubt its authenticity, and that he could identify Appellant on the video. Furthermore, Appellant testified at trial and identified herself in the video.

Appellant argues that the authentication fails because the State did not ask the assistant manager "specifically whether the surveillance system was working properly on the date in question." However, Appellant admits that the assistant manager "*did* affirmatively declare that the equipment made an accurate video recording of the events that were taking place" (emphasis added). If the camera system successfully recorded the events accurately, as the assistant manager testified, it is implied that the system was working properly at that time.

We have reviewed the surveillance footage and hold that the testimony was sufficient for the trial court to find that the videotape was what the witnesses and the State claimed it to be: a depiction of the early morning hours when Appellant was in Stripes shortly before Wallace found the green Crown Royal bag, the drug scales, and the pistol in the trash can in the restroom.[2] We therefore hold that the trial court did not err when it admitted the video portion of the videotape. We overrule Appellant's third issue on appeal.

---

[2]To the extent Appellant argues that pauses or minor gaps in the footage further preclude authentication, we find instructive the line of cases in which the courts address admissibility standards for videos with audio components: Minor gaps in a tape do not affect the reliability and trustworthiness of evidence, nor render it per se inadmissible. *See Gahl v. State*, 721 S.W.2d 888, 897 (Tex. App.—Dallas 1986, pet. ref'd) ("If the alteration is accidental and is sufficiently explained so that its presence does not affect the reliability and trustworthiness of the evidence, the recording can still be admissible." (quoting *Quinones v. State*, 592 S.W.2d 933, 944 (Tex. Crim. App. 1980))).

We affirm the judgment of the trial court.


JIM R. WRIGHT

SENIOR CHIEF JUSTICE


December 31, 2018

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.;
Gray, C.J., 10th Court of Appeals[3];
and Wright, S.C.J. [4]

Willson, J., not participating.

---

[3]Tom Gray, Chief Justice, Court of Appeals, 10th District of Texas at Waco, sitting by assignment to the 11th Court of Appeals.

[4]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.